Van Houten v. Post.

JOHN R. VAN HOUTEN, executor &c., appellant,

*v.*

GEORGE POST, respondent.

1. The fact that a bequest to a child is contained in the residuary clause of a will, does not prevent the application of the rule in regard to ademption.

2. To establish an ademption of a legacy, two facts must be shown: first, the advancement by the parent to the child subsequent to the execution of the will; and, second, that it was in satisfaction of or a substitute for such legacy.

3. The declarations of the testator, whether made in the legatee's presence or not, are competent evidence to prove an ademption.

4. Where an erroneous payment of a legacy is made by an executor, and the litigation on an exception to an allowance of such payment in his account, is unnecessarily and unreasonably protracted by him, he is chargeable with interest thereon from the time of such payment.

On appeal from decrees of the orphans court of Passaic county.

*Mr. John Hopper* and *Mr. J. D. Bedle,* for appellant.

*Mr. T. D. Hoxsey,* for respondent.

THE ORDINARY.

Rachel Van Houten, late of Paterson, died in 1863, leaving a last will, which was proved by the executors, her son George Post, and her son-in-law John R. Van Houten, on the 19th of May of that year. They filed their inventory on the same day. On the 29th of December, 1864, they filed their intermediate account, and it was allowed. A like account was filed April 27th, 1866, purporting to be the account of both executors, but sworn to by Van Houten only. To this account, Post filed exceptions, May 26th, 1866. Testimony was taken on the exceptions, and

the matter was argued before the orphans court in 1878 or 1879, and the exceptions were disposed of by the court by decree made February 3d, 1879. By decree made April 12th in that year, it was ordered that the account which had been reported by the surrogate, who had been ordered to restate it, with the corrections made necessary by the allowance of two of the exceptions, be settled as reported; and it was decreed that there was a balance of $46,833.48 in the hands of Van Houten, as executor. From the decree of the orphans court made on the exceptions, and from two others, made in March, 1879, one giving counsel fees, out of the estate, to the proctors of the exceptant, and the other settling the account as restated, the accountant appealed to this court.

The only question presented by the appellant on the argument of this appeal was, as to the correctness of the decree of the orphans court in refusing to allow the amount, $5,000, of a payment with which the accountant had, in his account, credited himself as having been made by him to his wife, February 1st, 1865, for a legacy of that amount given to her by the will. She was the daughter of the testatrix. The court also charged the accountant interest on the amount from the date just mentioned.

By the will, which is dated October 20th, 1857, the testatrix ordered the payment of her debts and funeral expenses, and then gave two legacies, of $800 each, to two of her grandchildren. She then gave her household furniture and clothing to her daughter Catharine, and then devised certain real estate to Catharine, and to her (the testatrix's) son George and her granddaughter Elizabeth Hall, respectively, and directed that certain other of her real estate should be sold, and the proceeds divided among the same persons in whose favor she had made the foregoing devises. She then gave to her before-mentioned granddaughter $6,000 worth of her other real estate, and then gave to. her executors all the residue of her property in trust, to collect the interest which should become due on her notes, bonds, mortgages and other securities, and the rents of her real estate, and to keep

Van Houten *v.* Post.

all the personal property invested on good security, and to lease the real estate at their discretion; and she empowered them to sell her real estate, if they should think it advisable to do so, either at public or private sale, but no sale of any part of it was to be made during the life of Aaron S. Pennington, without his consent and approval. And she empowered them to convey all lands sold, and directed them to invest and re-invest the proceeds of sale, except that out of the money arising from the sale of her land lying at Totowa, and a lot of about twelve acres on the two railroads south of the Paterson depot (which she directed them to sell as soon as conveniently might be after her death), she directed them to pay her daughter Catharine $5,000. The testatrix then directed the executors to pay an annuity to Maria Post, widow of her deceased son, and to provide support for her brother for his life. She then directed that, of the clear income of her estate, one-third be paid to her daughter Catharine until George's death; another third to George for life, and the rest to her grandson Adrian Post, after deducting the annuity to his mother, Maria Post. She then directed the executors to pay, out of the income of her estate, $6,000 to the children of her daughter Catharine, and then directing that, at her son George's death, her estate be closed and settled, she disposed of the residue, after reserving enough to meet all the provisions of the will, as follows: To Catharine, one-third; to such person or persons as George should, by will, appoint, or, if he should leave no will, then to his issue, one-third, except one-third of her Main street property, which she disposed of by specific provision; and the other third to her grandson Adrian, with a certain deduction and with certain limitations, and she then gave to George, Catharine and Adrian each $1,000, to be paid as soon as conveniently might be after her decease. She appointed George and the accountant executors and trustees of and under the will.

It will have been seen that out of the proceeds of the sale of certain of her real estate, the testatrix gave her daughter

Catharine a legacy of $5,000. That is the legacy which is the subject of controversy. The respondent, George Post, insisted, successfully, in the orphans court, that it had been adeemed or satisfied by the testatrix in her life-time, by an advance of $5,000 made by her to the legatee, after the making of the will, for the building of a dwelling-house on land devised to the legatee by the will.

Where a parent, or other person *in loco parentis*, bequeaths a legacy to a child or grandchild, and afterwards, in his life-time, gives a portion, or makes a provision for, the same child or grandchild, without expressing it to be in lieu of the legacy, if, in such case, the portion so received or the provision so made, on marriage or otherwise, be equal to or exceed the amount of the legacy; if it be certain, and not merely contingent; if no other distinct object be pointed out; and if it be *ejusdem generis*—then it will be deemed a satisfaction, or, as it is more properly expressed, an ademption of the legacy. *Story's Eq. Jur.* § *1111.* Or, as is said in *Sims* v. *Sims, 2 Stock. 158*, in the instance of a parent and child, equity raises the presumption that the legacy is intended as a portion, whether the will so expresses it or not, and if, afterwards, the parent advance a portion to the child, the legacy is satisfied, the advancement and the legacy being for the same purpose.

It is urged, on behalf of the appellant, that the fact that the bequest is contained in the residuary clause of the will, prevents the application of the rule in regard to ademption. But the position is not well taken. This is a legacy of a fixed amount, and, if it were not, the circumstance that it is in the residuary clause will make no difference. It is now held, that whether a residue shall be held to be adeemed or not, is a question of intention, as in other cases of ademption. *Montefiore* v. *Guedalla, 6 Jur. (N. S.) 329; Wms. on Ex'rs 1334, 1335.*

As was said in *Sims* v. *Sims, ubi supra*, the intention of the testator is the very essence of ademption. Two facts, therefore, must necessarily be established—the advance-

ment, and the intention of the testator that it was in satis-
faction or a substitute for the bequest.

It appears to me quite clear, from the evidence, that the
legacy in question was satisfied by the testatrix in her life-
time. The testimony of Aaron S. Pennington on the sub-
ject is direct, clear and positive, and, unless overthrown by
the denial of Catharine, is conclusive. He was the legal
adviser of the testatrix, and drew the will. The will was
executed October 20th, 1857. On the 26th of October,
1859, about two years afterwards, he was sent for by Catha-
rine to come to her house, where the testatrix was residing,
to see the latter.

The testatrix's mind had been disturbed by misrepresent-
ations made to her in regard to the provisions of the will.
He went to the house, taking with him the will, which had
been left in his hands for safe-keeping. He saw her there
in her room, and read the will over to her very carefully, so
that she might fully understand all its provisions and their
details. She declared herself satisfied with it. He says
that during that interview she spoke of the $5,000 legacy
given by the will to Catharine, and said that the latter had
had that money in building the house (referring to a brick
house which had been built by the accountant after the will
was made, on land specifically devised to his wife by the
will), as he understood it. He further says, that when he
came down-stairs (from the testatrix's room) he met Catha-
rine, who began to talk to him about what the testatrix had
said about the will, and, according to his recollection, he
told her that the testatrix said the will was drawn as she
had intended it to be, but he added that the testatrix had
said that that $5,000 had been paid on the house, and
Catharine replied that that was right. He says that when
he went to his office it occurred to him that there might be
some difficulty about the matter, and he made a memoran-
dum in pencil on the envelope containing the will, as follows:

"26 October, 1859. Mrs. Van Houten says the $5,000 given, Katy
has had in the house."

He says he supposed that he had also made a note of
Catharine's reply, but finds that he did not. He says his
recollection of having told Catharine what the testatrix said
about her having had the $5,000 in the house, is just as
clear and distinct as that the testatrix told him so, and so
clear and distinct that he was surprised that he did not find
Catharine's answer on the envelope; that his recollection
of Catharine's answer is also clear and distinct; and he
adds, that he asked the question for a specific reason, which
appears to have been to see whether Catharine admitted
the fact, for, he says, if Catharine had said that they had
not had it, he would have felt bound to go back and see
the testatrix and have a codicil made, but when Catha-
rine told him it was all right, he says he saw no necessity
for doing so. Mr. Pennington says, it may be remarked,
that, on the occasion of that conversation between him and
the testatrix, she seemed to " have her faculties more per-
fect than usual and to understand what the will contained."

This testimony is corroborated by that of Dr. Burr, who
was the testatrix's physician from 1857 to her death, in
1863. He says Catharine, in one of his visits to her house,
some time after the death of the testatrix, stated to him that
her husband built the houses " with money that her mother
let him have, and that he gave her his notes for it," and he
adds that subsequently, while he was attending the family,
Catharine said to him that her mother was in the habit
of destroying things, and had burned up those notes with
other things which she destroyed.

Catharine, indeed, denies that she made the reply to Mr.
Pennington which he swears she made, but there seems to
be no reason to doubt the accuracy of his memory, sup-
ported, as it is, by the memorandum. And, again, it is to
be remembered that he had no interest in the subject of the
controversy, while she had a deep interest therein. Her
statements of what passed between her and Mr. Pennington
not only differ from his, but they also differ from and are
inconsistent with each other. At one time (June 13th,

1877), she says that what Mr. Pennington said to her was that the testatrix had told him that George had told her, the day before, that the $5,000 had been paid on the house, and she says she replied that the testatrix had "talked in that insane way all night." Again, she says, in the same connection, that she understood Mr. Pennington to say that George had "made his mother believe" that she had paid the $5,000 in building the house. Afterwards (January 18th, 1878), she was called upon to state the transaction, and she narrates it thus: "He (Mr. Pennington) was with her (the testatrix) some time, not very long. I met him at the foot of the stairs, coming down, and he says to me, 'Why, Katy, your mother has been talking about people that I have never heard of before, and she says she has paid you the $5,000 she has left you in her will, and she says her son John has been here and taken a good deal of her money and gone to New York with it.' I said, 'Yes, my mother's talk is very foolish; poor John has been dead for a good many years.'" It will be seen that, in this version, nothing is said about George.

The respondent, George Post, swears that, shortly after the inventory of the estate was taken, Catharine told him she had received the $5,000, and he says it was long prior to February 1st, 1865, when the accountant paid the money to her, that she said it.

Catharine Barned, who nursed testatrix for about eighteen months, from March 1861, testifies that she heard the latter say, in the presence of Catharine, that her (the testatrix's) money built the house.

I now leave out of consideration all the testimony of the testatrix's declarations except those made in the presence of Catharine, or, as in the case of those sworn to by Mr. Pennington, repeated to her and responded to by her. The accountant and his wife both swear, indeed, that the testatrix furnished no money to build the house. It appears, however, by their testimony, that the proposition that the house should be built came from the testatrix; that the

accountant and his wife had no thought of building the house until long after the will was made; that the house was built on land devised by the testatrix to Catharine, and that the former promised to assist the accountant with money in building the house. And though the accountant subsequently (December 11th, 1867, about eleven years afterwards) stated the particular sources from which he obtained the money to build the house, that testimony must be compared with his testimony taken at the beginning (February 15th, 1867) of the testimony in the cause. He was then questioned on the subject, and testified as follows:

70. Did your wife ever receive any money from Rachel Van Houten, to your knowledge, during the life-time of the deceased?

A. She has made my wife presents of some money—yes.

71. When did she make your wife presents of some money?

A. Well, it was some time before her death; I don't recollect the time now.

72. Cannot you give some idea when it was?

A. I cannot, exactly; she gave her presents, and used to give the other heirs some, too.

73. Was it before or after the old lady made her will, that she gave your wife the money, as you say?

A. I cannot recollect that.

74. Was it before or after you or your wife built the brick house in which you now live?

A. I guess it was before that.

75. Do you not know whether it was or was not before that?

A. It was before that, I think.

76. What makes you think so?

A. I think it was before that; what makes me think so, I can't answer that.

77. Did you build that brick house after the old lady gave your wife some money?

A. I think it was built after that, yes.

78. How much money did the old lady let your wife have at any one time?

A. I do not know, sir; I don't know the amount.

79. How much did your wife have from the old lady altogether.

A. Oh, I can't tell about that; I can't tell, I do not know.

80. Was it as much as $5,000?

Van Houten *v.* Post.

A. No, it was not $5,000.

81. Do you mean that you did not have $5,000 from the old lady in all, or do you mean that she did not have $5,000 at one time?

A. I mean she never had $5,000 of her at all.

82. Did she have altogether, from the old lady, as much as $4,000 in money?

A. No, sir.

83. Did she have as much as $3,000?

A. I cannot tell; I forget about that, what amount she had.

84. Who supplied the money used to pay for building the brick house in which you now live?

A. That's my business; I built that brick house myself and paid for it.

85. When did you build that brick house?

A. Well, I forget the time; I could not tell unless I was at home to see my papers; I do not recollect back so far.

86. State, as nearly as you can, how many years it is since you built it?

A. I could tell if I was home.

87. Is it as much as eight years since you built that house?

A. I don't know; I can't recollect so far back.

88. Who owned the lots on which you built that house, at the time you built it?

A. My mother-in-law, I believe, owned them at that time; she made her will at that time, and it was understood that my wife was to have those lots.

89. Did or did not Rachel Van Houten, deceased, furnish some part of the money to build that house?

A. No, sir.

90. Where did you get the money from to build it?

[His counsel objected to the question, and instructed him that he was not obliged to answer that question unless he got the money from the testatrix].

A. I don't answer.

91. Did you get any portion of the money with which that house was built, from your wife?

A. I did.

92. How much of it?

A. Well, I can't tell the amount of it; I forget; she gave me some money at different times.

93. How much money did your wife furnish you at any one time for the building of that house?

A. I can't tell; I kept no account of it; I don't recollect.

94. How much did the house cost?

A. How much did it cost? that's my business.

95. How much money did you pay for the building of that house, over and above what you got from your wife, for the building of that house?

A. I can't tell.

96. Have you any papers by which you can tell how much money you received from your wife for the building of that house?

A. No, sir.

97. Did you receive, in all, from your wife, for the building of that house, as much as $5,000?

A. No, sir.

98. Did you receive from her as much as four?

A.. I've been asked that question before, twice over; I can't answer that; I don't recollect anything about it.

99. If you don't recollect anything about it, how did you know that you did not receive from her as much as $5,000?

A. Well, I know it wasn't $5,000; I know it wasn't as much as that.

100. How do you know?

A. I don't recollect all the particulars of this thing; I can't answer how I know.

101. Did the house cost as much as $5,000 to build it?

A. That's my business, what the house cost; I built it and paid for it.

102. Did your wife give you all the money which it cost to build that house?

A. Not at all, sir.

103. How much did it cost more than she gave you?

A. That's my business, about what it cost.

104. From whom did your wife obtain the money which she gave you to build that house?

A. Why, I think it was the money she got from mother-in-law; I think so.

105. Do you not know from whom she got it?

A. No; I do not, exactly.

106. Did or did not your wife tell you from whom she got that money?

A. No, sir; she did not tell me of whom she got it; she had some money of her own, that her mother had given her.

107. How much?

A. I said she had some money of her own before, her mother had given her.

108. How much money did your mother-in-law give your wife—state as nearly as you can?

Van Houten *v.* Post.

A. Well, I have been asked that question two or three times, and I told you I did not know; she made her presents; George was up there at different times; she made him presents, too; she made presents to the other heirs.

While, in giving the testimony just quoted, the accountant was unwilling to state whether the amount of money which he said he received from his wife to assist him in building was as much as $4,000, saying he could not recollect, she says it was not more than $850, and admits that she received some of it (she says not more than $350) from her mother.

It is urged, in behalf of the accountant, that the fact that Mr. Pennington drew the receipt for the legacy to be signed by Catharine, and that he drew the account in which allowance for the payment was claimed, detracts from the weight of his testimony, and is evidence of inaccuracy of recollection on his part. But as to the receipt, he says he supposes he was requested by the accountant to draw it, and that he drew it as directed. He further says, he does not believe that any particular conversation took place when he drew it, for the reason that he did not " mean to be mixed up in that matter, and would not be counsel on either side." The accountant, when asked whether Mr. Pennington advised him to pay the $5,000 to his wife, did not say that he did. He says that when the receipt was drawn there was nobody in Mr. Pennington's office, where it was drawn, except him and Mr. Pennington, and his wife says that he told her that Mr. Pennington would draw a receipt, and after she had signed it he would give her a check for the money. The receipt was drawn and the account made out by Mr. Pennington, undoubtedly as a mere matter of business, and the fact that he drew the one and made out the other casts no doubt on the accuracy of his statement as to the conversations with the testatrix and Catharine on the subject of the legacy of $5,000.

Thus far in the consideration of the case the declarations of the testatrix, except such as were made in the presence

of or repeated to Catharine, and by her responded to, have been left out of view. But, in connection with the testimony of Mr. Pennington that the testatrix told him that the legacy was satisfied by the money given by her to Catharine in building the house, and that the latter admitted it, and the testimony of Dr. Burr and Catharine Barned, before mentioned, on the subject, others of her declarations are of importance. Dr. Burr, who, as before stated, was called as a witness for the accountant, testifies that it is his impression that, as he thinks, in 1859, before the accountant had moved into the new house, the testatrix told him that she would let Catharine have, or had let him (George) have, $5,000 in building the new house. . Elizabeth Hall, a granddaughter of the testatrix, testifies that the building of the new house was the subject of daily conversation on the part of the testatrix; that it was to be a brick house—a double house—one part of it to be occupied by the testatrix and the witness's mother's family, and the other by the accountant's family; that the sum to be given by the testatrix for the house was $5,000. Dr. Burr says the testatrix told him that George wanted her to give him as much money as she was giving Catharine to build the house.

The legacy was, presumably, given as a portion. The testatrix declared that she had satisfied it by the subsequent advancement to the legatee of an equal sum used in the building of a house on land devised by her to the legatee, and the legatee admitted. not only that the advancement was made, but that it was made in satisfaction of the legacy.

The testimony on the exceptions to the account in the orphans court was begun February 15th, 1867, and was not closed until May 24th, 1878, a period of over eleven years. It comprises five thousand three hundred and fifty-five questions and answers, and covers nine hundred and fifty-eight large, printed pages. It is composed, to a great extent, of utterly irrelevant disclosures of family matters, the object of which could only be to inflict pain or blacken reputation, and it is impossible for conjecture to suggest a good reason

Van Houten *v.* Post.

or even a plausible excuse for a litigation so protracted and expensive, upon these exceptions.

There being no appeal from that part of the decree of the orphans court which directs payment of the costs of the respondent out of the estate, I am not at liberty to deal with it as I otherwise would, and require the appellant to pay them out of his own pocket. The decree of the orphans court will be affirmed, with costs of the appeal to be paid by the appellant, out of his own funds.